1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   DIANE SUNKEN,                          No. CIV S-05-1867-CMK

12              Plaintiff,

13        vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

14   JO ANNE B. BARNHART,
     Commissioner of Social Security,

15
               Defendant.
16
     _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security pursuant to 42 U.S.C. §

20   405(g).  Pursuant to the consent of the parties, this case is before the undersigned for final

21   decision on plaintiff's motion for summary judgment (Doc. 18) and defendant's cross-motion for

22   summary judgment (Doc. 21).

23   / / /

24   / / /

25   / / /

26   / / /

                                              1

# I. BACKGROUND

Plaintiff applied for disability insurance benefits on November 17, 2003, based on disability.  In her application, plaintiff claims that her impairment began on August 14, 2003.  Plaintiff requested a closed period of disability to terminate sometime in May 2005.[1]  In a Disability Adult Report submitted with her application, plaintiff claims her disability consists of a combination of: irritable bowel syndrome, severe depression, hiatal hernia, fibromyalgia.[2]  In the same report, plaintiff also stated: "I am extremely fatigued, uncontrollable bowel movements, become very nauseated, sudden flu-like symptoms w/ headaches, sudden crying spells."  Plaintiff is a United States citizen born September 25, 1963, with an eleventh grade education.

## A.   Summary of the Evidence

The record contains the medical file from Sutter Roseville Medical Center.  On April 11, 2002, plaintiff underwent a hysterectomy secondary to chronic uterine pain.  Discharge notes prepared by David H. Scates, M.D., on April 17, 2002, state that plaintiff underwent the procedure with little blood loss and did well overnight.  By the second day, plaintiff was eating and moving around and was "ready to go home."  A diagnostic imaging report of an abdominal

/ / /

---

[1]     Plaintiff began full-time employment as an accounts payable clerk and expects to continue this employment indefinitely.  The date she began this employment, however, is unclear.  The April 14, 2005, hearing decision states that plaintiff returned to work on February 4, 2005 – just over two months after the decision was issued – and that she requested a closed period ending approximately three months after that.  The parties also recite these dates in their briefs.  At the March 1, 2005, hearing, however, plaintiff's counsel stated that plaintiff returned to work in February 2004 and requested that the closed period end three months after that, per the regulations.  The record contains a document from plaintiff's employer, Robert Half International, Inc., confirming that plaintiff began employment in February 2005.  In any event, for the reasons discussed herein, the discrepancy makes no difference.

[2]     In the hearing decision, plaintiff's initial complaints are characterized as: irritable bowel syndrome, severe depression, acid reflux associated with a hiatal hernia, Meniere's disease, and fibromyalgia.  In her brief, however, plaintiff states that she has the following disorders: irritable bowel syndrome, fatigue, diarrhea, headaches, abdominal cramping, post-traumatic stress disorder, and major depressive disorder.  Plaintiff also states in her brief – for the first time – that she suffers from obesity.

and pelvic examination on July 2, 2003, revealed:  (1) status post cholecystectomy[3]; (2) no evidence of appendicitis; (3) status post hysterectomy; and (4) no evidence of intra-abdominal or intrapelvic inflammatory process.   An imaging report of an abdominal examination on September 9, 2003, revealed "normal bowel gas pattern."

The record also contains the medical file from Rolf N. Gulbrandson, M.D.  Notes from July 17, 2003, state:

> The patient returns on the recommendation of Drs. Adolfo and Scates, having undergone a hysterectomy . . .  She apparently developed a cuff bleed and hematoma requiring evacuation by Dr. Scates one month later. She did well until six months ago when she began to experience pelvic pain, which has since been persistent, and has spread to the abdomen, particularly the right upper quadrant, as well.  She has noted fatigue, but no other gastrointestinal, genitourinary, or constitutional symptoms.  She was seen by Dr. Scates, and a pelvic ultrasound was unremarkable.  A urologic evaluation, including cystoscopy, was likewise unfruitful.  Three weeks ago, she noted a "flu syndrome," with aching, particularly of her joints.  She was seen by Dr. Adolfo, and a white count was discovered to be 23,000.  The hemoglobin was 15.6, and a chemistry panel was unrevealing.  She was referred to the emergency room, where she was seen the next day, at which point the white count was 19,400.  A urinalysis was unremarkable, as was a CAT scan of the abdomen and pelvis.  With persistent pelvic and right upper quadrant abdominal discomfort, she was referred for evaluation.  The patient has a history of depression, but is otherwise in excellent health.  She routinely takes Zoloft and Vicodin.  She is allergic to sulfa.  She has undergone a right inguinal herniorrhaphy, cholecystectomy, and ovary-sparing hysterectomy, with subsequent exploration for bleeding, as described.  There is no significant family history. . . .  Examination of the abdomen reveals moderate tenderness to minimal palpation in the right upper quadrant.  The remainder of the abdomen is spared.  However, tenderness is noted bilaterally in the suprapubic area.  This appears somewhat more prominent on the right than the left.  The bowel sounds are normal.  There are no obvious masses or organomegaly.  There is a well-healed . . . incision. There are no apparent hernias. . . .  I explained to the patient that I am a little unclear as to what has caused her right upper quadrant and bilateral suprapubic discomfort and tenderness, in the fact of normal studies.

Notes from July 21, 2003, indicate that plaintiff "returns complaining of pain in 'both kidneys' and a metallic taste."  Notes from August 4, 2003, indicate that plaintiff's blood count was

---

[3]        Surgical removal of the gallbladder.

normal.  On July 30, 2003, plaintiff underwent a full-body scan which revealed "a normal liver, spleen, and bone marrow distribution.  There are no focal areas of WBC deposition."  The scan report concluded with the impression that no evidence of "occult pyogenic processes" was documented.

The record includes the medical file from Greater Sacramento Surgery Center, where plaintiff underwent an esophagogastroduedenoscopy[4] on September 15, 2003.  This procedure revealed a small hiatal hernia.  Otherwise, the esophagus, stomach, and duodenum were normal.  The report ended with the following: "Reason for pain must be looked for elsewhere, but considering extensive evaluation so far and duration, most likely irritable bowel."

In the Adult Disability Report submitted with her application for social security benefits on November 17, 2003, plaintiff states that her impairments caused her to make changes in her job.  Specifically, plaintiff states: "I was too fatigued and would have to leave work early.  I was away from my desk a lot because of the uncontrollable diarrhea.  I felt so horrible, I couldn't focus on work."  As to why she stopped working, plaintiff stated: "Doctor felt I was too stressed and the stress of a difficult life at home and work was aggravating illnesses.  I was having accidents at work.  My mind and body were unable to function properly."

On December 2, 2003, plaintiff submitted a Daily Activities Questionnaire.  As to difficulties caring for her own personal needs, plaintiff stated:

> I can't afford household assistance, my husband and children help.  Sometimes I feel exhaustion by 10:00 a.m. and have to crawl back in bed.  Showering exhausts me and sometimes I hurt so bad I just don't want to get dressed or even out of bed.

Plaintiff states that she cooks simple meals for herself and her family three to four times per week, but that bigger meals require her family to help.  She also stated she does all the family shopping every two weeks, and that her family only sometimes helps with this chore.  As to

---

[4]     Endoscopic examination of the esophagus, stomach, and duodenum usually performed using a fiberoptic instrument.

other household chores, plaintiff states that she does very light house cleaning, but that she cannot vacuum.  She sweeps and mops, but usually only one or the other.  She can do laundry, but putting things away exhausts her and makes her "ache worse."  Plaintiff states that she can't scrub anything and that her family puts away their own clothes and does the vacuuming.  As to hobbies and activities, plaintiff states: "None anymore.  I used to go to gym and tanning salon, I love to sing, I go to choir practice on Thursday evenings and church every Sunday."  Plaintiff states that, when she goes out, she drives a car because: "Don't walk too far or too long because I'll get sick and need a restroom right away.  I'm also too achy and tired to walk."  She states that she had no difficulties getting along with family, friends, co-workers, or others.  Plaintiff says that her social life has changed since her condition began because: "I can't go too far from a restroom, and I always hurt."  Finally, plaintiff states that she cares for her husband, who has hearing difficulties, her three-and-a-half-year-old son, her thirteen-year-old son with kidney disease, a cat, dog, and two birds.  Plaintiff also has an 18-year-old son with emotional difficulties.

On December 2, 2003, plaintiff also submitted an Exertional Daily Activities Questionnaire.  As to how her symptoms prevent her from working, plaintiff states: "I have accidents in my clothes.  I'm in pain.  I'm fatigued and I can't concentrate."  She also states that, after walking for five or ten minutes her "insides churn up and [she gets] unexpected diarrhea."  When climbing just 16 to 20 stairs her "insides cramp up and . . . ache."  As to her lifting and carrying capabilities, plaintiff states that she can lift small items weighing 15 to 20 pounds two to three times a day, but that she can't carry such a load or she hurts inside.  She states that she can, however, carry a smaller load of five to ten pounds a distance of 10 to 15 feet a "couple times daily."  Plaintiff states that she used to work on her car and do yard work, but that she can't do these things anymore.  As to sleep, plaintiff states that she sleeps for two to three hours at a time during the night and that she sleeps from about 10:30 p.m. to 6:30 a.m.  She also states that she has to "sit or lay down every 15-20 minutes.  If I lay down to nap, I could sleep for 4-5

1  hours." Plaintiff states that she takes the following medications: Zoloft, Effexor, Donnatol,

2  Bentyl, Librax, and Protonix.

3         Next, the record contains a physical residual functional capacity assessment

4  prepared on December 22, 2003, by C. Eskander, M.D., an agency consultative reviewing

5  physician. Dr. Eskander did not examine plaintiff, but prepared his assessment based on a

6  review of the available medical record.[5] Dr. Eskander opined that plaintiff could occasionally

7  lift and carry 20 pounds and frequently lift and carry 10 pounds. Dr. Eskander opined that

8  plaintiff could stand and/or walk about 6 hours in an 8-hour workday, that plaintiff could sit for

9  the same time, and that plaintiff was unlimited with respect to pushing and pulling. Dr. Eskander

10 stated that no postural, manipulative, visual, communicative, or environmental limitations were

11 established. Dr. Eskander's assessment was reviewed and affirmed by C. Richard Dann, M.D.

12         The record contains the medical file from Travis H. Owens, Psy.D., who

13 performed a comprehensive psychological examination and evaluation of plaintiff at the request

14 of the agency. In his January 19, 2004, report, Dr. Owens stated:

15              Mrs. Sunken denied current suicidal ideation. Mrs. Sunken
                reported current use of Effexor, Librax, Donnatol, Portonix, and Bentyl,
16              all dosages unknown. Information obtained from Mrs. Sunken regarding
                interpersonal relationships indicates that her ability to relate is
17              unimpaired. During the interview, she gave the impression that she was
                having moderate difficulty interacting with her world and maintaining
18              social functioning.

19              There appeared to be moderate impairment in Mrs. Sunken's
                ability to participate in daily activities. Her independent living skills are
20              unimpaired. Mrs. Sunken's abstract thinking appeared unimpaired. Her
                judgment also appeared unimpaired. Mrs. Sunken has the cognitive
21              ability to handle funds and is able to manage funds responsibly. It is not
                likely that she would mismanage their use for self-medication with drugs
22              and alcohol.

23              Mrs. Sunken's ability to understand, remember, and carry out
                simple instructions appears to be moderately impaired in terms of
24              attendance, as a result of her depression and over-active bowels. Mrs.

25  _____

26         [5]    Dr. Eskander noted that no treating or examining source statements were in his
    file.

6

1             Sunken's ability to deal with changes in a routine work setting appears to
              be unimpaired.  Her ability to maintain attention and concentration
2             appears to be mildly impaired.

3  Dr. Owens diagnosed plaintiff with moderate major depressive disorder.

4          On February 6, 2004, plaintiff was evaluated by Donald R. Walk, M.D., who

5  prepared a mental residual functional capacity assessment with attached Psychiatric Review

6  Technique Form.  Dr. Walk opined that plaintiff was moderately limited in the ability to

7  maintain attention and concentration for extended periods of time.  Plaintiff was also assessed

8  with a moderate limitation to her ability to complete a normal workday and workweek without

9  interruptions from psychologically based symptoms and to perform at a consistent pace and

10  without an unreasonable number and length of rest periods.  Otherwise, Dr. Walk opined no

11  other limitations.  Dr. Walk concluded that plaintiff had a depressive syndrome characterized by

12  sleep disturbances, psychomotor retardation or agitation, decreased energy, feelings of guilt or

13  worthlessness, and difficult concentrating or thinking.  Dr. Walk assessed plaintiff with a mild

14  limitation in activities of daily living, a moderate limitation in maintaining social functioning, a

15  moderate limitation in maintaining concentration, persistence, or pace, but offered to assessment

16  as to episodes of decompensation.  It should be noted that, nowhere on the assessment forms

17  completed by Dr. Walk, does he point to any objective evidence to support his conclusions.

18          The record also contains one item from plaintiff's treating physician, Lorna

19  Adolfo, M.D.  In a document prepared on February 1, 2005, for Dr. Adolfo by her physician's

20  assistant Ms. Stenhouse, plaintiff's residual functional capacity was assessed in light of her

21  irritable bowel syndrome complaints.  The document identified plaintiff's symptoms as including

22  the following: (1) chronic diarrhea; (2) abdominal pain and cramping; (3) malaise; (4) fatigue;

23  (5) depression; (6) vertigo; and (7) abdominal distention.  The document stated that plaintiff is

24  not a malingerer.  It also stated that emotional factors do not contribute to plaintiff's symptoms.

25  The document stated that plaintiff frequently experiences pain or other symptoms severe enough

26  to interfere with attention and concentration.  The document opined that stress aggravates

plaintiff's irritable bowel syndrome.  It assessed plaintiff with the capability of continuously

sitting for one to two hours, and continuously standing for one hour.  The document stated that

plaintiff could walk six city blocks.  It also opined that, in an 8-hour day, plaintiff could

sit/stand/walk about 2 hours total.  The document also opined that plaintiff must be able to shift

positions at will from sitting, standing, or walking.  It stated that plaintiff would be required to

have access to a bathroom and would need to take three to four 10 to 15 minute bathroom breaks

each workday.  The document also stated that plaintiff would need to be able to lie down and rest

at unpredictable intervals two to three times a day for 30 minutes at a time.  As to lifting and

carrying, while the document opined that plaintiff could lift and carry 20 pounds, it did not

specify whether this could be done occasionally or frequently.  The document stated that plaintiff

could stoop 20% of the time, and crouch less than 10% of the time during a regular workday.

Finally, the document opined that plaintiff would be expected to be absent from work about four

times a month due to her impairments.  It is not clear whether the document reflects Dr. Adolfo's

impressions following an examination of plaintiff or whether it reflects Ms. Stenhouse's

assessments.

## B.   **Procedural History**

Plaintiff's claim was initially denied.  Following denial of her request for

reconsideration, plaintiff requested an administrative hearing, which was held on March 1, 2005,

before Administrative Law Judge ("ALJ") Antonio Acevedo-Torres.

In his April 14, 2005, decision, the ALJ made the following findings:

1.  Ms. Sunken meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in . . . the Social Security Act and is insured for benefits through the date of this decision;

2.  From August 14, 2003, to February 3, 2005, Ms. Sunken did not engage in substantial gainful activity, a period of more than 12 months; However, as of February 4, 2005, Ms. Sunken has engaged in [substantial gainful activity], earning in excess of the $830 threshold amount pursuant to 20 C.F.R. § 404.1574;

///

3.     The claimant's irritable bowel syndrome, vertigo, and acid reflux disease attributable to a small hiatal hernia are considered severe impairments, whereas her depression is considered a non-severe impairment based on the requirements in the Regulations . . . ;

4.     These medically determinable impairments do not meet or medically equal one of the listed impairments . . .;

5.     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision;

6.     The claimant has the following residual functional capacity: she can lift, carry, push, and pull 10 pounds frequently, 20 pounds occasionally; she can stand/walk or sit up to 6 hours each during the course of an 8-hour workday; she has no other postural, manipulative, visual, communicative, or environmental limitations;

7.     The claimant is able to perform her past work as a receptionist-accounts receivable clerk, or as an accounts receivable clerk-project coordinator, both as she performed those jobs and as similar jobs are generally performed in the national economy;

8.     Alternatively, the claimant is a younger individual between the ages of 18 and 44;

9.     Alternatively, the claimant has a limited education;

10.    Alternatively, the claimant has performed skilled and semi-skilled work; however, transferability of skills is not a pivotal issue in this case;

11.    Alternatively, the claimant has the residual functional capacity to perform the full range of light work;

12.    Alternatively, based on an exertional capacity for light work, and the claimant's age, education, and work experience, Medical-Vocational Rules 202.21 and 202.22 . . . direct a conclusion of not disabled; and

13.    The claimant was not under a disability . . . at any time through the date of this decision.

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits.  After the Appeals Council declined review on July 20, 2005, this appeal followed.

/ / /

/ / /

/ / /

9

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## III.  DISCUSSION

In her motion for summary judgment, plaintiff argues that: (1) the ALJ improperly rejected the opinion of her treating physician, Dr. Adolfo, and other medical opinions; (2) the ALJ improperly rejected her pain testimony as not credible; and (3) the ALJ failed to consider her non-exertional limitations and, as a result, improperly applied the Medical-

1  Vocational Guidelines ("Grids").[6]  Plaintiff also makes the conclusory statement in her brief that

2  "the Commissioner failed to consider the impact of obesity," but offers no actual argument in

3  support of this contention.[7]

4      A.   **Medical Opinions**

5          The weight given to medical opinions depends in part on whether they are

6  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

7  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

8  professional, who has a greater opportunity to know and observe the patient as an individual,

9  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

10  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

11  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

12  (9th Cir. 1990).

13          In addition to considering its source, to evaluate whether the Commissioner

14  properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

15  in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

16

17      [6]    Plaintiff's brief is not well organized.  For example, under the heading discussing
the ALJ's consideration of non-exertional limitations, plaintiff challenges the ALJ's credibility

18  assessment as well as the ALJ's consideration of certain medical opinions.  Further, it appears
that plaintiff's arguments as to non-exertional limitations are really part of her argument that the
ALJ misapplied the Grids by improperly finding that plaintiff's non-exertional limitations are not

19  significant enough to require vocational testimony.  The court has endeavored to group
plaintiff's arguments in a more logical fashion.

20
      [7]    The court finds any obesity argument to be specious.  First, plaintiff does not

21  offer any points and authorities in her brief in support of such an argument.  Second, plaintiff
never alleged during the course of administrative proceedings that obesity is an impairment or

22  that it exacerbates other impairments.  Third, plaintiff never stated that obesity was the cause of
any limitation in function.  Fourth, no medical source has suggested that obesity is an

23  impairment or exacerbates other impairments.  It is up to the plaintiff to allege obesity as an
impairment and to provide medical evidence in support of the claim.  See Burch v. Barnhart, 400

24  F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya v. Halter, 332 F.3d 1177 (9th Cir. 2003),
and concluding that a multiple impairment analysis is not required where "the medical record is

25  silent as to whether and how claimant's obesity might have exacerbated her condition" and "the
claimant did not present any testimony or other evidence . . . that her obesity impaired her ability

26  to work").

uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

Plaintiff challenges the ALJ's consideration of the opinions of Dr. Adolfo, Dr. Walk, Dr. Eskander, and Dr. Owens.  Specifically, plaintiff asserts that the ALJ should have given greater weight to Dr. Adolfo's opinions and none to the opinion of Dr. Walk.  Plaintiff also asserts that the ALJ ignored the existence of medical records from Dr. Adolfo as well as from plaintiff's treating psychiatrist, Mehdi Moghaddas, M.D.

      1.    Medical Records Allegedly Not Considered by the ALJ

In her motion for summary judgment, plaintiff argues:

The ALJ specifically stated in his decision that he was aware of medical records from treating physicians Dr. Adolfo and Dr. Stokes but made his decision without medical records from said treating sources.

> This is also true for psychiatric medical records from treating psychiatrist Mehdi Moghaddas, M.D.  The ALJ erred as a matter of law in not obtaining these records; he failed in his "special duty" to fully and fairly develop the record to assure that Ms. Sunken's interests were considered.

As to records allegedly not considered, the record reflects that the ALJ stated:

> Although Ms. Sunken has allegedly received medication for her depression, [irritable bowel syndrome], and acid reflux disease from Lorna S. Adolfo. M.D., and C. Stokes, neither Ms. Sunken nor her representative have submitted treating records or other medical evidence from these practitioners, other than the aforementioned residual functional capacity questionnaire prepared by Dr. Adlolfo's physician's assistant, Ms. Stenhouse, on February 1, 2005.  Ms. Sunken also alleged that she underwent a psychiatric evaluation and has received continued psychiatric treatment from Mehdi Moghaddas, M.D., for severe depression. However, neither she nor her representative have submitted medical records from this source, or indicated that they need additional time to secure evidence from Dr. Moghaddas or any other medical source. Accordingly, the undersigned enters the following decision based upon the existing evidentiary record.

Based on the forgoing, the court finds that plaintiff has misstated the record. Contrary to plaintiff's assertion that the ALJ was aware of the existence of records from Drs. Adolfo and Moghaddas but decided to ignore them, the ALJ was only aware of the <u>alleged</u> existence of such records, as reported by plaintiff.  It was incumbent upon plaintiff or her counsel to prove the existence of her alleged impairments by providing medical evidence.  <u>See</u> 20 C.F.R. §§ 404.1508, 416.908.  In this case, the ALJ did not ignore evidence that existed. Rather, he merely recited the alleged existence of certain medical records and stated that plaintiff had not met her burden of producing such evidence or seeking additional time to do so.

2.    <u>Dr. Adolfo</u>

Plaintiff contends that the ALJ ignored or improperly discredited Dr. Adolfo's opinions regarding: (1) fecal incontinence; (2) stress; (3) other non-exertional limitations, such as shifting positions, need for unscheduled breaks, and limitations on stooping and crouching; (4) a reduced residual functional capacity; and (5) pain.  It must be noted that there are no documents in the record which represent Dr. Adolfo's opinion.  The only document from Dr.

1    Adolfo's practice is the February 1, 2005, assessment prepared by Ms. Stenhouse, Dr. Adolfo's

2    assistant.  As to this assessment, the ALJ stated:

3                In this case, little evidentiary weight is accorded Ms. Stenhouse's
             assessment, as it appears to have been based primarily upon Ms. Sunken's
4                subjective complaints "often reported as disabling" and is not supported
             by any treating records from Dr. Adolfo's practice or any other source.
5                Ms. Stenhouse [did] not describe any supportive medical findings, and her
             opinion is not shown to be supported by the other available medical
6                evidence of record.  She has failed to cite clinical findings or diagnostic
             test results that are consistent with the degree of limitation she and the
7                claimant allege.  Moreover, her opinion of such extreme limitation
             prepared on February 1, 2003, is inconsistent with the claimant's active
8                employment search, which culminated in her acceptance of full-time work
             beginning February 4, 2005, and continuing through the date of the
9                hearing.  Ms. Sunken testified that she has not had any significant
             problems working as an accounts payable clerk, and her verified earnings
10               do not reflect that she has frequent or excessive absences that would
             prevent her from performing sustained work.

11

12               The court cannot find any evidence in the record actually representing <u>Dr.</u>

13   <u>Adolfo's</u> opinion.  While the February 1, 2005, assessment arguably reflects Ms. Stenhouse's

14   opinion, she is not a doctor.  To the extent the February 2005 assessment does represent Dr.

15   Adolfo's opinion, the court finds that the ALJ did not err in giving it little weight.  As the ALJ

16   correctly observes, the assessment does not cite to any objective findings or observations.  While

17   the assessment certainly contains expressions of plaintiff's functional capabilities, they are not

18   based on any clinical findings.  Moreover, as the ALJ also noted, if plaintiff were as limited as

19   the February 1, 2005, assessment suggests, she would not have bene able to secure full-time

20   employment beginning just three days later on February 4th.  Finally, Ms. Stenhouse's

21   assessment of plaintiff's capabilities is inconsistent with the assessments of Drs. Eskander,

22   Owens, and Walk, discussed below.

23               Here, even assuming that Ms. Stenhouse's assessment somehow reflects Dr.

24   Adolfo's medical opinions, the court finds that the ALJ properly rejected it because it was not

25   supported by clinical findings.   See <u>Meanel</u>, 172 F.3d at 1113; <u>see also</u> <u>Magallanes</u>, 881 F.2d at

26   751.  The court concludes, therefore, that the ALJ cited specific and legitimate reasons for

14

1    rejecting Ms. Stenhouse's assessment, which is contradicted by the opinions of other medical

2    professionals.

3                    3.    Dr. Eskander

4                    Dr. Eskander, an agency consultative reviewing physician who did not examine

5    plaintiff, prepared a physical residual functional capacity assessment on December 22, 2003,

6    based on his evaluation of the available medical records.  As to Dr. Eskander, plaintiff states:

7                           The ALJ basically rejected the opinions as to limitations as set
                      forth by treating physician Dr. Adlolfo.  Instead, the ALJ adopts a
8                     limitation that permits light work.  The ALJ found that Ms. Sunken can
                      lift, push, pull ten pounds frequently and twenty pounds occasionally; can
9                     stand, walk or sit up to six hours each in an eight-hour day; and has no
                      other postural, manipulative, communicative, or environmental
10                    limitations.  This finding was based upon a State Agency non-examination
                      report of December 22, 2003, by C. Eskander, M.D., and approved by C.
11                    Richard Dann, M.D. . . .  These State Agency physicians never treated the
                      claimant, never examined the claimant, and were unaware of the opinions
12                    of treating physician Dr. Adolfo.  This report also fails to mention or take
                      into account the extent of fecal incontinence of Ms. Sunken in reaching
13                    their conclusions.

14   As to Dr. Eskander's report, the ALJ stated:

15                           Based on the available evidence, the DDS medical consultants [Drs.
                      Eskander and Dann] concluded that Ms. Sunken could perform a full
16                    range of light work with minimal mental limitations.  She could lift, carry,
                      push, and pull 10 pounds frequently, 20 pounds occasionally.  She could
17                    stand/walk or sit up to 6 hours each during the course of an 8-hour
                      workday.  She had no other postural, manipulative, visual,
18                    communicative, or environmental limitations. . . .

19                           * * *

20                           The finding that the claimant can perform a significant range of light
                      [work] on a sustained basis is supported by the objective clinical findings,
21                    and the claimant's activities and treatment regimen.  This finding is
                      consistent with the findings of DDS medical consultants C. Eskander,
22                    M.D., and C. Richard Dann, M.D., who also reviewed the medical
                      evidence at the initial and reconsidered levels of the administrative review
23                    process and concluded that Ms. Sunken could perform light work.

24                    Given the ALJ's finding and to plaintiff's physical residual functional capacity, it

25   is clear that he accepted the opinion of Dr. Eskander.  Plaintiff essentially argues that this was

26   error because Dr. Eskander never treated or examined her.  This argument seems to be based on

                                                     15

1   the rule that the opinion of a non-examining professional, without other evidence, is insufficient

2   to reject the opinion of a treating or examining professional.  Plaintiff takes the position that Dr.

3   Adolfo's opinion should control because she treated and examined plaintiff.  However, as

4   discussed above, Dr. Adolfo did not actually render any opinion.  Rather, the record only

5   contains Ms. Stenhouse's assessment, which does not appear to have been based on any

6   examination or objective observations and findings.  Moreover, the opinions of non-examining

7   sources can constitute substantial evidence where there is other evidence in the record to support

8   the opinions.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  Here, the ALJ cited to

9   "other evidence" – specifically, plaintiff's statements as to her activities as well as evidence of

10  her treatment regimen.

11          For the foregoing reasons, the court concludes that the ALJ did not err in

12  accepting Dr. Eskander's assessment.  There simply was no better source for an opinion as to

13  plaintiff's physical capabilities.

14                  4.      Drs. Walk and Owens

15          Drs. Walk and Owens provided opinions as to plaintiff's mental residual

16  functional capacity.  Dr. Walk evaluated plaintiff on February 6, 2004, and prepared a mental

17  residual functional capacity assessment with an attached Psychiatric Review Technique Form.

18  Dr. Owens conducted a comprehensive psychiatric examination of plaintiff and prepared a report

19  on January 19, 2004.  As to Dr. Owens, the ALJ stated:

20              . . . [I]n January 2004, [plaintiff] told the consultative examiners that she
                had benefitted from family counseling in 2001, but didn't have the
21              resources to continue with treatment after that date.  Her performance on
                mental status examination and formal cognitive testing revealed that she
22              had no impairment in her ability to understand, remember, and carry out
                simple instructions; respond appropriately to supervisors, coworkers, and
23              members of the public; and deal with changes in a routine work setting.
                Her ability to maintain attention and concentration was only mildly
24              impaired, and her ability to maintain regular attendance was judged to be
                moderately impaired, but this was because of her [irritable bowel
25              syndrome], as much as any depressive symptoms.

26  ///

> When considering this psychological evaluation together with her activities of daily living . . . the undersigned finds that her depression imposes minimal restrictions.  Although Ms. Sunken takes anti-depressant medication, the record establishes that her depression would impose no limitations on her ability to perform activities of daily living, and only minimal limitations on her social functioning and ability to maintain concentration, persistence, and pace.  There is no evidence that she has ever experienced an episode of deterioration or decompensation, or that she is likely to.  Thus, as her depression does not impose any significant, vocationally relevant limitations it is thus considered to be a "non-severe" impairment. . . .

The ALJ included in his decision an accurate and detailed summary of Dr. Owens' report, as detailed above.  As to Dr. Walk, the ALJ summarized his opinion as follows:

> . . . Because of her depression, [plaintiff] would have moderate limitations in her ability to maintain attention and concentration for extended periods, and she would have moderate limitations on her ability to complete a workweek and perform at a consistent pace.
>
> * * *
>
> . . . While DDS psychiatric consultants Donald R. Walk[], M.D., and F. Mateu, M.D., assessed that [plaintiff's] depressive disorder would reduce her concentration, persistence, and pace, and limit her public interaction, the record reflects that this finding was based upon her statements in a single consultative examination.

From this it is clear that the ALJ accepted Dr. Owens' assessment, and rejected Dr. Walk's.

As to Dr. Walk's opinion, plaintiff argues that the ALJ erred in concluding that his opinion was not based on objective evidence.  Plaintiff cites to one page from Dr. Walk's notes in support of her contention that Dr. Walk "extensively discussed a multitude of documentary evidence."  Specifically, that page reflects that Dr. Walk reviewed medical records from September 2003 and October 2003, as well as Dr. Owens' January 2004 report.  Dr. Walk's notes as to the September and October 2003 documents indicate that those reflected plaintiff's subjective complaints.  As to Dr. Owens' report, Dr. Walk's notes indicate that he merely summarized Dr. Owens' findings.  In fact, Dr. Walk made specific notes of Dr. Owens' conclusion that plaintiff was only mildly impaired with respect to maintaining concentration.

/ / /

1    As to Dr. Owens, plaintiff simply states that the "ALJ improperly gave little or no

2 weight . . . to the opinion of . . . State Agency examining psychologist Dr. Owens. . . ."  This is

3 not the case.  As discussed above, the ALJ's analysis makes it clear that he accepted Dr. Owens'

4 less restrictive assessment and rejected Dr. Walk's more restrictive assessment.  As between the

5 opinions of Drs. Owens and Walk, the ALJ properly gave more weight to the opinion of the

6 examining professional – Dr. Owens – and less weight to opinion of the non-examining

7 professional – Dr. Walk.

8    **B.    Plaintiff's Credibility**

9    The Commissioner determines whether a disability applicant is credible, and the

10 court defers to the Commissioner's discretion if the Commissioner used the proper process and

11 provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit

12 credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

13 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

14 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

15 and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

16 evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

17 credible must be "clear and convincing."  See id.

18    If there is objective medical evidence of an underlying impairment, the

19 Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

20 because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

21 341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

22 the symptoms alleged, including aggravating factors, medication, treatment, and functional

23 restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider:

24 (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

25 testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

26 prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

1   physician and third-party testimony about the nature, severity, and effect of symptoms.  See

2   Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

3                   As to plaintiff's credibility, the ALJ first set forth the following summary of

4   plaintiff's testimony:

> Ms. Sunken testified that her condition really hasn't changed or improved
> since August 14, 2003, even through she is presently working full-time.
> She testified that her work "is going okay" despite her impairments.  Her
> previous statements of record and statements to examining sources reveal
> that she engaged in a wide range of daily activities that would not be
> consistent with a disabling level of pain, depression, or dysfunction
> attributable to [irritable bowel syndrome].  Ms. Sunken was able to care
> for herself and her two minor children, one of whom is seriously ill.
> Although she put her toddler in daycare 3 times per week when she could
> afford it, she was able to care for him at all other times without assistance.
> She drove [her] older child to and from school each day, drove herself to
> medical appointments, and spent the rest of the day doing light
> housekeeping chores, preparing simple meals, reading, watching
> television, or resting.  She visited regularly with friends and family.
> These activities do not support the degree of pain or dysfunction Ms.
> Sunken has alleged.

14   The ALJ later stated:

> There is a lack of medical documentation of an impairment(s) that would
> cause extreme pain or dysfunction that would have compromised Ms.
> Sunken's ability to perform all work-related activities.  The record as a
> whole does not reveal that she was, or is, precluded from performing all
> regular, sustained work activity.  The level of medication she has taken
> and her level of daily activities suggest that her symptoms are, or were,
> sufficiently controlled to enable her to perform work activity throughout
> the relevant period.  Her daily activities are consistent with basic work-
> related activities, and she has not participated in therapeutic treatment and
> dietary management normally associated with bowel dysfunction and pain.
> Consequently, I find that the claimant's allegations of pain and such
> extreme limitation are not fully credible and consistent with the medical
> record.

22   Plaintiff argues that the ALJ erred in his evaluation of her credibility with respect to her pain

23   symptoms by misstating the record.[8]   Plaintiff also argues that the ALJ erred by not considering

24   the factors specified in Social Security Ruling ("SSR") 96-7p.  Thus, plaintiff challenges both

---

[8]       Plaintiff cites to the portion of the ALJ's summary of plaintiff's testimony
reproduced in this section.

1  the ALJ's statements of fact and application of the law.

2              1.    <u>The ALJ's Statements of Fact</u>

3          First, plaintiff challenges the ALJ's statement that "Ms. Sunken was able to care

4  for herself and her two minor children."  Plaintiff asserts in her brief that an accurate reading of

5  the record reflects that she actually stated that "she could just barely take care of herself and her

6  family.  As to the level of this 'taking care of,' it is quite limited."  In support of this assertion,

7  plaintiff cites to page three of the Exertional Daily Activities Questionnaire she submitted on

8  December 2, 2003.  There, plaintiff stated: "I just barely take care of myself and my family. . . ."

9  The court finds that the ALJ's statement is consistent with the portion of the record cited by

10 plaintiff, as well as the rest of the record as a whole.  Specifically, the court notes that plaintiff

11 stated in another questionnaire submitted on December 2, 2003, that: (1) she cooks simple meals

12 for herself and her family three to four times per week; she does all the family shopping every

13 two weeks; (2) she does very light house cleaning, but cannot vacuum; (3) she sweeps and mops,

14 but only one or the other; and (4)  she does laundry, but does not put items away.  She also stated

15 that she cares for her husband, who has hearing difficulties, her three-and-a-half-year-old son,

16 her thirteen-year-old son with kidney disease, a cat, dog, and two birds.

17         Next, plaintiff challenges the ALJ's statement that ". . . she was able to care for

18 [her toddler] at all other times without assistance" as not supported by the record.  The court

19 disagrees.  In the December 2, 2003, Exertional Daily Activities Questionnaire, plaintiff stated:

20 "I put my 3 1/2 year old in daycare 3 days a week because I don't have the energy to chase him

21 around everyday."  The logical inference to be drawn from this statement is that, other than the

22 three days she puts her child in daycare, she is able to take care of him without that assistance.

23         Next, plaintiff challenges the ALJ's statement that she "visited regularly with

24 friends and family."  Citing to page 4 of the December 2, 2003, Daily Activities Questionnaire,

25 plaintiff asserts that her actual statement was that her brother visits her once a week and that she

26 talks on the phone with relatives.  Again, the court does not find the ALJ's statement to be

inconsistent with the record as a whole.  On the same questionnaire, plaintiff stated that she attends community, church, and other social events two times per week.  She also stated that she talks on the phone with relatives daily.  Notably, plaintiff also stated that she has no difficulty getting along with family and friends.

Finally, plaintiff challenges the ALJ's statement that she "spent the rest of the day doing light housekeeping chores, preparing simple meals, reading, watching television, or resting."  Speaking to plaintiff's typical day, this statement is entirely consistent with the record.

2.    The ALJ's Application of the Law

In conjunction with her arguments concerning the ALJ's statements of fact, plaintiff argues that, because the ALJ's legal analysis of her credibility was based on incorrect facts, it is not supported by specific, cogent reasons.  Obviously, given the discussion above, the court rejects this argument.

Plaintiff also argues that the ALJ erred in his credibility evaluation by failing to consider the factors set forth in SSR 96-7p.  Specifically, plaintiff states that SSR 96-7p requires the adjudicator to consider: (1) medical signs and laboratory findings; (2) medical opinions; (3) statements and reports from the claimant and others about the claimant's history; (4) treatment and response; (5) daily activities; (6) consistency of the claimant's statements; and (7) efforts to relieve symptoms.  In view of the ALJ's credibility analysis reproduced above, it is clear that the ALJ did in fact consider these factors.  Moreover, because as discussed above the ALJ correctly stated the record, the court finds that the ALJ stated specific and cogent reasons for rejecting plaintiff's testimony as not fully credible.

/ / /

/ / /

/ / /

/ / /

## C.   <u>Application of the Grids</u>[9]

The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual functional capacity.  The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity.  <u>See</u> <u>Heckler v. Campbell</u>, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the Grids).

The Commissioner may apply the Grids in lieu of taking the testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations.  <u>See</u> <u>Jones v. Heckler</u>, 760 F.2d 993, 998 (9th Cir. 1985); <u>see</u> also <u>Heckler v. Campbell</u>, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the Grids if a claimant suffers from non-exertional limitations because the Grids are based on strength factors only.  <u>See</u> 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids."  <u>Penny v. Sullivan</u>, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities.[10]  <u>See</u> <u>Bates v. Sullivan</u>, 894 F.2d

---

[9]     In section VI.A. of her brief, plaintiff discusses her arguments relating to non-exertional limitations and, in section VI.D., argues that the ALJ's alleged errors with respect to consideration of non-exertional limitations preclude application of the Grids and, instead, require vocational testimony.  Because all these arguments go to the propriety of relying on the Grids in lieu of the testimony of a vocational expert, the court discusses all these arguments together.

[10]     Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work.  <u>See</u> 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  <u>See</u> 20

1    1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

2            In cases where the Grids are not fully applicable, the ALJ may meet his burden

3    under step five of the sequential analysis by propounding to a vocational expert hypothetical

4    questions based on medical assumptions, supported by substantial evidence, that reflect all the

5    plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

6    where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

7    ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

8    1341 (9th Cir. 1988).

9            Plaintiff argues as follows:

10           The ALJ failed to obtain [vocational expert] testimony, since he
             found that no significant non-exertional impairments existed.  As
11           discussed above, the record is replete with evidence as to physical non-
             exertional impairments, emotional impairments, and pain that negatively
12           impacts the claimant's ability to do work.
                 To reach his findings of no significant non-exertional impairments,
13           the ALJ improperly gave little or no weight whatsoever to the opinions of
             treating physician Dr. Adolfo, medical records, State Agency examining
14           psychologist Dr. Owens, and the claimant.  This ALJ places error upon
             error.  Non-exertional impairments exist and the ALJ was in error in
15           following the Grids under these circumstances and failing to call for
             testimony from a vocational expert was in error.
16

17   Plaintiff alleges that the ALJ failed to properly consider the following non-exertional limitations:

18   (1) fecal incontinence; (2) inability to stoop; (3) need to shift position at will from sitting,

19   standing, or walking; (4) need to take unscheduled breaks once or twice a day for up to 30

20   ─────────────────────────

21   C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at
     a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§
22   404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
     with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§
23   404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
     with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§
24   404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
     100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
25   See 20 C.F.R. § 404.1567(e) and 416.967(e).
             Non-exertional activities include mental, sensory, postural, manipulative, and
26   environmental matters which do not directly affect the primary strength activities.  See 20
     C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

1    minutes at a time; (5) stress; (6) pain; (7) depression; (8) impact of medications; and (9)

2    emotional problems.[11]

3            As to impact of medications, plaintiff asserts that the ALJ completely ignored

4    these factors.  This is simply incorrect.  In the hearing decision, the ALJ stated:

5            Although Ms. Sunken reported significant side effects from her
                medication, including unacceptable drowsiness, fatigue, sluggishness, and
6            lightheadedness, treating records do not reflect similar complaints or
                observations of daytime somnolence or unacceptable fatigue, which
7            interfered with her daily activities as described.  Although Ms. Stenhouse
                indicated that she would need frequent rest breaks because she had 8-10
8            bowel movements daily, and the Protonix and Bentyl caused drowsiness,
                her statements of such extreme limitation have been discounted.  Not only
9            are they inconsistent with the claimant's report of her daily activities, they
                are also inconsistent with her testimony and previous reports of only 3
10           bowel movements daily.  At present, she is currently working and taking
                medications for irritable bowel syndrome, depression, and vertigo.
11           Accordingly, the undersigned finds that any side effects from Ms.
                Sunken's medication regimen would impose no more than a minimal
12           limitation on her ability to perform sustained work.

13   The court rejects plaintiff's suggestion that the ALJ failed to state reasons supported by the

14   record for discounting the effect of medications.

15           Finally, as to fecal incontinence, plaintiff argues:

16           The ALJ ignored the impact of fecal incontinence on Ms. Sunken's
                residual functional capacity.  To do so, the daily activities of Ms. Sunken
17           were misstated and ignored by the ALJ.  Further, the existence of
                employment records evidencing a lack of fecal incontinence was cited by
18           the ALJ although none existed.

19   First, as to plaintiff's assertion that the ALJ misstated the record with respect to plaintiff's daily

20   activities, the court rejects this argument for the reasons discussed above.  Next, as to

21

22        [11]    As to inability to stoop, need to shift position, need for unscheduled 30-minute
     breaks, and limitations due to stress, plaintiff argues that all these limitations are opined by Dr.
23   Adolfo, her treating physician, but not properly considered by the ALJ.  This argument is
     addressed in section III.A.2.  As to pain, plaintiff argues that the ALJ erred with respect to
24   evaluating her credibility.  This argument is discussed in section III.B.  As to depression and
     emotional problems, plaintiff admits that the ALJ did in fact consider her depression and
25   recognized limitations it causes.  To the extent plaintiff argues that the ALJ erred by not
     accepting Dr. Walk's more limited assessment of the effects of her depression, that argument is
26   discussed in section III.A.4.

1 | employment records, those records do exist and are part of the record before this court.

2 | Specifically, an earnings report from plaintiff's current employer is included in the certified

3 | administrative record at pages 110-11, and shows that plaintiff works a normal full-time

4 | workweek.  This leads to the logical inference that her employment is not being significantly

5 | disrupted by her impairments, including fecal incontinence.

6 | ### IV.  CONCLUSION

7 | The essence of plaintiff's case is that she was so limited by her impairments that

8 | she could not work at all during the closed period.  However, plaintiff does not contend that her

9 | condition improved by the time she returned to work.  If this were the case, it would make sense

10 | that, even though she can work now, she was disabled during the closed period.  Instead, she

11 | characterizes all of the medical evidence – even evidence compiled at the very end of the closed

12 | period – as showing that she was as limited when the closed period ended as she was when the

13 | closed period began.  Given that plaintiff has successfully returned to work, and because she has

14 | not alleged an improvement in her condition, it is not logical to conclude that she is, or was,

15 | disabled.

16 | Based on all of the foregoing, the court concludes that the Commissioner's final

17 | decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS

18 | HEREBY ORDERED that:

19 | 1.      Plaintiff's motion for summary judgment is denied;

20 | 2.      Defendant's cross-motion for summary judgment is granted; and

21 | 3.      The Clerk of the Court is directed to enter judgment and close this file.

22 | DATED:   September 27, 2006.

24 | **CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE